UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MONICA MARGARITA                           CIVIL ACTION
BARRIOS-BARRIOS ET AL.

VERSUS                                     NO. 10-837

DARRIUS CLIPPS ET AL.                      MAGISTRATE JUDGE
                                           JOSEPH C. WILKINSON, JR.

**ORDER AND REASONS ON MOTION**

This is a civil rights action filed by plaintiffs, Monica Margarita Barrios-Barrios

("Monica") and her brother, Christopher Antonio Barrios-Barrios ("Christopher"),

against defendants, the City of New Orleans, the New Orleans Police Department, former

Police Superintendent Warren Riley and former Police Officer Darrius Clipps. Plaintiffs

allege that Clipps, while employed as a police officer, invaded plaintiffs' home under the

pretense of a police drug investigation and, while in the home, sexually molested and

threatened both plaintiffs. Clipps was arrested and pled guilty to sexual battery of

Monica, home invasion and malfeasance in office. He is currently incarcerated.

Plaintiffs seek damages for unlawful entry, unlawful arrest, sexual assault, excessive

force, conspiracy, negligent hiring, and failure to train and supervise Clipps adequately

pursuant to 42 U.S.C. § 1983, and for false arrest, home invasion, sexual battery and

malfeasance in office under Louisiana state law. Record Doc. No. 1, Complaint.

This matter was referred to the undersigned magistrate judge for all proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon written consent of all parties.  Record Doc. No. 44.

The City of New Orleans and former Superintendent Riley ("the City Defendants") filed a motion for summary judgment, supported by the entire transcript of Clipps's deposition, seeking dismissal of plaintiffs' claims against them.  The City Defendants contend that they are not vicariously liable under Louisiana law for Clipps's intentional torts because his actions were taken outside the course and scope of his employment. They also argue that plaintiffs cannot establish that any official policy or custom of the City Defendants caused their injuries.  Record Doc. No. 66.

Plaintiffs filed a timely opposition memorandum, Record Doc. No. 68, supported by the same transcript of Clipps's deposition already filed by defendants, Plaintiffs' Exh. A; Christopher's affidavit, Plaintiffs' Exh. B; Monica's affidavit, Plaintiffs' Exh. C; a 158-page report entitled "Investigation of the New Orleans Police Department" purportedly by the United States Department of Justice Civil Rights Division, dated March 16, 2011, Plaintiffs' Exh. D; the sworn report of plaintiffs' expert, Lee Dresselhaus, regarding the City Defendants' hiring and training practices in general and the hiring and training of Clipps in particular, Plaintiffs' Exh. E; Dresselhaus's curriculum vitae, Plaintiffs' Exh. F; and a few pages from the New Orleans Police

Department's pre-employment background investigation report of Clipps, Plaintiffs' Exh. G (pp. 8, 9, 10 and 13 and two unnumbered signature pages of a 13-page report).

The City Defendants received leave to file a reply memorandum. Record Doc. Nos. 72, 75, 76. Their reply includes a new exhibit, consisting of the certified records of Clipps's convictions from the Orleans Parish Criminal Court. Record Doc. No. 76-1. Ordinarily, the court would be required to give plaintiffs a reasonable time to respond to the new exhibit. Fed. R. Civ. P. 56. However, it is undisputed that Clipps was convicted of sexual battery on Monica, home invasion and malfeasance in office. Thus, the new exhibit adds nothing of value to the record and is unnecessary to resolution of the summary judgment motion.

The City Defendants object to the admissibility of the Justice Department report submitted by plaintiffs on grounds that the report contains hearsay within hearsay, is unauthenticated, lacks foundation and is irrelevant. Some of these objections have merit. First, the report is not authenticated. Fed. R. Evid. 901. Second, the Justice Department's investigation of the New Orleans Police Department "covered incidents that occurred within the past two years and assessed practices as they exist currently." Plaintiffs' Exh. D, Record Doc. No. 68-6 at p. 7 (p. iv of the report). Thus, the time frame of the report is <u>after</u> Clipps was hired and trained in 2007-2008, and just barely includes the date when he committed his tortious acts. Much of the report may be

irrelevant simply based on the time frame.  Third, although the report seems to fall within

the hearsay exception for the factual findings of a government agency investigation, Fed.

R. Evid. 803(8),[1] it contains inadmissible hearsay within hearsay, Fed. R. Evid. 805, and

apparent expert opinions,[2] without any foundation for the introduction of those opinions.

Fed. R. Evid. 702.  On the other hand, an expert like Dresselhaus may rely in his opinion

on facts or data that are not otherwise admissible.  Fed. R. Evid. 703.  Therefore, I have

considered the Justice Department report only to the extent that Dresselhaus relies on it

in his own report for his own opinions.

Because the deposition transcript filed by both parties contained the unredacted

date of birth and social security number of the deponent, in violation of Fed. R. Civ.

P. 5.2(a), I ordered the Clerk of Court to remove from the record page 8 of Record Doc.

No. 66-2 and page 8 of Record Doc. No. 68-1, and ordered the parties to file substituted

versions of these documents from which all but the last four numbers of the social

---

[1]The following are <u>not</u> excluded by the hearsay rule:
Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, . . . , or (C) in civil actions and proceedings . . . , factual findings resulting from an investigation made pursuant to authority granted by law, <u>unless</u> the sources of information or other circumstances indicate lack of trustworthiness.
Fed. R. Evid. 803(8) (emphasis added).

[2]"The investigative team consisted of lawyers and other staff from the Civil Rights Division's Special Litigation Section.  Throughout our investigation, our understanding was informed by the expertise of law enforcement professionals . . . and other experts working alongside Division attorneys." Justice Department report, Plaintiffs' Exh. D, Record Doc. No. 68-6, at p. 26.

security numbers and the year of birth have been redacted.  Record Doc. No. 69.  Both parties re-filed the redacted pages.  Record Doc. Nos. 71, 73.

Plaintiffs received leave to file a supplemental memorandum in opposition after they deposed two New Orleans Police Department supervisors who are currently in charge of recruitment and training, Commander Bernell Nevil, Jr., and the Deputy Chief of Management Services, Stephanie Landry.  Record Doc. Nos. 82, 84, 85.  Plaintiffs initially filed a memorandum with a summary of the relevant new testimony.  Record Doc. No. 85.  They also included as Exhibit A to this memorandum the New Orleans Police Department's complete pre-employment background investigation report of Clipps, Record Doc. No. 85-1, which plaintiffs had previously submitted only partially as Plaintiffs' Exh. G, Record Doc. No. 68-9.  After they received the transcripts of the depositions of Commander Nevil and Deputy Chief Landry, plaintiffs received leave to file the identical memorandum, but with the transcripts attached as Exhibits B and C.  Record Doc. Nos. 83, 86, 87.  Plaintiffs allege that the new testimony and the complete background investigation report support their Monell claims.

Having considered the complaint, the record, the submissions of the parties and the applicable law, IT IS ORDERED that defendants' motion for summary judgment is GRANTED IN PART, as to plaintiffs' Section 1983 claims against the City Defendants under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978), and DENIED IN PART,

as to plaintiffs' claims against the City Defendants for vicarious liability as to their Louisiana law causes of action, for the following reasons.

I.      STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 was revised to "take effect on December 1, 2010, and shall govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending."  Order of the Supreme Court of the United States (Apr. 28, 2010), www.supremecourt.gov/orders/courtorders/frcv10.pdf.   Because "the standard for granting summary judgment remains unchanged" by the revision, Federal Civil Judicial Procedure and Rules, 2010 Amendments Advisory Committee Notes, at 260 (West 2011 rev. ed. pamph.) (hereafter "Advisory Committee Notes"), I find it just and practicable to apply the revised Rule 56 in this proceeding.

Revised Rule 56 establishes new procedures for supporting factual positions:

(1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
     (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case. Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact." Advisory Committee Notes, at 261.

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if a rational trier of fact could not find

for the nonmoving party based on the evidence presented.   Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

　　　　To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.   Id. (citing Celotex, 477 U.S. at 321-23); accord U.S. ex rel. Patton v. Shaw Servs., L.L.C., 418 F. App'x 366, 371 (5th Cir. 2011).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."   Celotex, 477 U.S. at 323; accord U.S. ex rel. Patton, 418 F. App'x at 371.

　　　　"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."   Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).   "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."   Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted) (emphasis in original).  "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the

complaint."'" Nat'l Ass'n of Gov't Employees, 40 F.3d at 713 (quoting Anderson, 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); accord Duron v. Albertson's LLC, 560 F.3d 288, 291 (5th Cir. 2009).

II.    FACTUAL BACKGROUND

The following material facts are accepted as undisputed for purposes of the City Defendants' motion for summary judgment.  To the extent that Clipps's deposition testimony differs from the affidavits of both plaintiffs, the fact disputes are resolved in favor of plaintiffs' version of the facts, solely for purposes of the pending motion.

Clipps was born in 1972.  He received a G.E.D. in 1992.  He was 34 years old when he applied to be a New Orleans police officer in June 2007.  He was 35 years old when he was accepted as a recruit and began training at the police academy in September 2007.

During the Police Department's pre-employment background check, Clipps reported that he had received traffic citations in May 2006, April 2005 and June 1999.

An investigator visited the Orleans Parish Traffic Court and found that Clipps had received traffic citations on April 4, 2005 for two violations; May 24, 2004 for two violations; June 23, 1999 for two violations; April 14, 1999 for five violations; October 10, 1998, two separate citations for three and four violations, respectively; March 13, 1998 for one violation; and January 3, 1991 for one violation. All of the citations were paid. Expert report of Lee Dresselhaus, Plaintiffs' Exh. E, Record Doc. No. 68-7 at pp. 2-4; Background investigation report, Plaintiffs' Exh. G, Record Doc. No. 68-9 at pp. 1-3.

Clipps testified in his deposition that he had been arrested a couple of times for driving with a suspended driver's license. He stated that, although he had paid the tickets that led to the suspension, he had failed to have his license reinstated. His driver's license suspension had been resolved before he applied to the Police Department, and he had a valid driver's license at that time.

Clipps testified that he had been arrested when he was between 20 and 24 years old for being in a stolen vehicle, but that the charge was thrown out. He stated that he reported this arrest to the Police Department during his background check. He testified that he had no other arrests before he applied to the Police Department.

Plaintiffs allege that Clipps admitted during his background investigation "to three (3) arrests, one as a juvenile and two as an adult, one of which is a felony." This general

statement is contained in the report of plaintiffs' expert, Lee Dresselhaus.  Plaintiffs'

Exh. E, Record Doc. No. 68-7 at p. 1.  Dresselhaus's report incorporates three pages from

the New Orleans Police Department's background investigation, and plaintiffs submitted

those same pages as a separate exhibit, see Plaintiffs' Exh. G, Record Doc. No. 68-9

(consisting of five pages, two of which are signature pages, of a report that on its face

totaled 13 pages).  Although neither of these exhibits contains the particular page

regarding Clipps's arrests to which Dresselhaus refers, the complete 13-page background

report was later filed as Plaintiffs' Exhibit A to their supplemental memorandum in

opposition.  Record Doc. No. 87-1.

The background report reveals that Clipps told the police department investigator

he had been arrested for shoplifting at age 16 in 1988, in April 1999 (at age 27) during

a traffic stop for possession of a stolen vehicle, and in April 2005 for driving with a

suspended driver's license.  Clipps explained to the investigator that, when he was

arrested for possession of a stolen vehicle, he had borrowed the car from a friend and did

not know it was stolen.  Id. at p. 5.  The investigator spoke to a clerk in the Criminal

District Court for the Parish of Orleans, who advised that the charge had been refused in

July 1999 due to insufficient evidence.  The investigator's checks with several other

police agencies in the region revealed "no record of additional arrests, warrants, or any

other negative information."  Id. at p. 6.

Clipps testified that the police academy training lasted eight hours per day, five days per week, for 16 to 18 weeks.  He said the training included "a whole block of classes" and written materials regarding how to search an individual for drugs and what a police officer legally could and could not do.  He estimated that one to five days of training were devoted to this subject.  Deposition of Darrius Clipps, Defendants' Exh. 1, Record Doc. No. 66-2 at pp. 26-28.  He stated that he received a "big book . . . with all the rules of a police officer," which he read and kept.  Id. at p. 29.  He said he was tested after every block of instruction and he passed all but three tests:  a traffic test, his first fitness test and a third test that he could not recall.  He testified that he was required to take those tests again and he passed all of them the second time.

Clipps graduated from the police academy in April 2008 and became a patrolman, assigned to the Second District of New Orleans.  Like all new officers, he was on probation for his first year.  His duties as a patrolman sometimes included searching individuals for drugs, but he was not assigned to any narcotics task force.

Clipps was disciplined for a performance of duty violation on December 24, 2008, after he and his partner had responded to a call about a dog fight.  He testified that the man who was bitten by a dog did not want to file a report, so Clipps and his partner did not file one.  He and his partner did not know that New Orleans Police Department policy required all dog bites to be reported.  Clipps was verbally reprimanded for failing to file

12

a report.  This was his only disciplinary incident before the events at issue in the instant lawsuit.

Around March 12, 2009, while wearing his uniform and on his way to work, Clipps randomly encountered two men whom he knew from a job that he had held at a hotel several years earlier.  He knew only the first names of the two men, Carlos and Raphael.  Carlos and Raphael told Clipps that an unnamed, middle-aged, Hispanic man was selling drugs out of a house on Iberville Street and another unnamed, young, Hispanic man was selling drugs out of a house on South White Street.  The informants did not give Clipps any addresses, but they described the two houses, stating that the one on South White Street had a sofa on the porch.  The two houses were not in the Second District where Clipps was assigned to work.

Clipps worked the night shift from 10:25 p.m. to 7:00 a.m.  He decided to find out whether the tips he had received from Carlos and Raphael were true.

Clipps testified that he went to the Iberville Street house (which was not the Barrios's home) when he got off work at 7:00 a.m. on March 13 or 14, 2009.  He was wearing his police uniform, including his badge and name tag, but was not carrying his gun.  He drove his own Ford Expedition.  He testified that he knocked on the door, introduced himself to the man who answered the door, said that he was investigating a report of drugs being sold at this address and asked if he could look around.  The man

invited him inside.  He asked the man and two women who were inside the house to show him their identification and to raise their shirts above their waistbands to make sure they did not have any guns.  He testified that he did not touch any of the people in the house.

Clipps stated that, when he saw no evidence of any criminal activity after looking around the Iberville Street house for a few minutes, he apologized and left.  He said he did not even know if he was in the right house.  However, he testified that he returned to the same house a day or two later about the same time of day, when he was off duty but wearing his uniform, because he remembered that there was a safe in the house and he thought maybe the occupants of the house had stashed drugs in the safe.  He said he again knocked on the door, talked to the same man, apologized and left.

According to the affidavits of Monica and Christopher, Monica was sitting on the front porch of her house on South White Street with a friend, Jorge Ramirez, when Clipps drove up in a dark-colored sports utility vehicle on March 15, 2009.[3]  Clipps exited the vehicle, shone a flashlight in the faces of Monica and Ramirez, and identified himself as a New Orleans police officer.  Monica believed that Clipps was on duty because he was wearing a police uniform, a leather duty belt, a radio and handcuffs.  Clipps stated that

---

[3]Monica and Christopher aver in their affidavits that the incident occurred about 9:30 p.m., while Clipps testified that it was shortly after 7:00 a.m.  Regardless whether the incident occurred at 9:30 p.m. or 7:00 a.m., it is undisputed that Clipps was off duty at the time.

he was searching for illegal drugs and ordered Monica and Ramirez to go into the house. Christopher was inside the house.  Clipps identified himself as a New Orleans police officer when he entered the house.

Clipps spoke into his police radio about the Barrios residence.  He told plaintiffs that he was going to search the house for drugs.  He canvassed the living room, searched under the furniture and inside the television cabinet, but found no drugs.

Clipps ordered Christopher and Ramirez into the kitchen and Monica into the living room.  He ordered Christopher and Ramirez to strip, then opened Christopher's butt cheeks and inspected his anal cavity.  Clipps ordered Monica to undress.  When she refused, he threatened her with handcuffs.  Clipps then performed a strip search and body cavity search on Monica.[4]

Concerning his motives for entering both the Iberville Street house and the Barrios house on South White Street, Clipps testified that

> I then, being stupid as you can see, I went to these places just – don't ask me why.  I went stupidly to see, just to check and see, okay, if these guys [Carlos and Raphael] – see what they're talking about. . . . [M]y intent

---

[4]In his deposition, Clipps denied that he told either plaintiff to strip or that he touched either of them.  For purposes of the pending summary judgment motion, this fact dispute is resolved in favor of plaintiffs' statements in their affidavits.  Furthermore, Clipps's guilty plea and conviction for sexual battery of Monica establishes that he engaged in "intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, when . . . [t]he offender acts without the consent of the victim."  La. Rev. Stat. § 14:43.1(A).

actually was to just go there and see if there was anything – any truth to
what these guys were telling me.

Clipps deposition, Defendant's Exh. 1, Record Doc. No. 66-2 at pp. 39-40; <u>see also</u> <u>id.</u>

at p. 64 ("I decided to just go and see if what these guys were telling me was true.").

Clipps stated that, if he had found any evidence of drugs at the houses,

then I would have, you know, informed, you know, someone else.  But
before I did that, I was like, man, let me see if anything is, you know, true
to this before I say anything to anybody.
Q.    So at that point you were doing investigative work?
A.    If you want to call it that. . . .
Q.    Were you investigating the situation?
A.    Not like – yeah, I guess I was.

<u>Id.</u> at p. 40.  He stated that

I would have first let my superiors know that, hey, I talked to these people
and they let me know and, yes, there are drugs at this location.  I would
have let them know exactly what happened and how I happened upon it.
I would have let them know that, yes, there were drugs there.  That's what
I [was] checking to see if what these guys told me was true.
Q.    So your intention.  Your intention for being there was to investigate
       possible criminal activity; is that correct?
A.    I – you could – you could say that because had I found anything I
       would have let my superiors know about it.  Yeah.

<u>Id.</u> at p. 68.

When Clipps went to the Barrios house on South White, he did

[t]he exact same thing as [at] the Iberville address. . . .  I told them . . . that
I had a report of drugs being sold from the house and I was pretty much
there to check and see is it okay, I mean can you prove that, you know, no
drugs or anything being sold . . . .  And again I just . . . looked through the
house visually. . . .  And again it was the same exact procedure I did at

Iberville.  I just, you know, hey, let me make sure you guys don't have any weapons on you.

Id. at pp. 49-50.  He testified that "I gave my name and stated why I was there."  Id. at p. 54; see also id. at p. 64 ("saying I was searching for drugs").

Clipps also testified that his duties as a patrol officer sometimes involved looking for drugs, searching persons for drugs and following up if he suspected the presence of narcotics.  Id. at p. 57.

Clipps never informed anyone at the Police Department about his investigations of either the Iberville Street or South White Street house.  He was subsequently arrested and pled guilty to sexual battery of Monica, home invasion and malfeasance in office in connection with the March 15, 2009 incident.  He also pled guilty to a second charge of home invasion and two charges of aggravated burglary, apparently arising out of his entry into the house on Iberville Street.  He is currently serving a sentence totaling seven years on all the convictions.

III.   ANALYSIS

    A.   Genuine Disputes of Material Fact Preclude Summary Judgment on Plaintiffs' Claims of Vicarious Liability Under State Law

The City Defendants[5] argue that they cannot be vicariously liable under Louisiana law for the intentional torts committed by Clipps because he was <u>not</u> acting within the course and scope of his employment with the New Orleans Police Department when he took those actions against plaintiffs. Plaintiffs respond that Clipps was in the course and scope of his employment because he had just gotten off duty,[6] was in his uniform, used his position of authority as a police officer to gain access to the Barrios residence and to strip search plaintiffs, and was serving the purposes of the Police Department by searching for drugs. They also argue that, because his conviction for malfeasance in office required a finding that he performed his duty as a government employee in an unlawful manner, he was necessarily in the course and scope of his employment at the time of the incident. Based on Louisiana Supreme Court precedent, as discussed below,

---

[5]The City Defendants did not file a motion for summary judgment on behalf of the New Orleans Police Department because, under Louisiana law, a police department is not a juridical entity capable of being sued. <u>Martin v. Davis</u>, No. 06-1770, 2007 WL 763653, at *2 (E.D. La. Mar. 8, 2007) (Berrigan, J.) (citing La. Rev. Stat. § 33:361; <u>Dugas v. City of Breaux Bridge</u>, 757 So. 2d 741, 744 (La. App. 3d Cir. 2000)) (additional citations omitted); <u>accord</u> <u>Hicks v. Page</u>, No. 10-cv-0084, 2010 WL 2243584, at *2 (W.D. La. Feb. 26, 2010) (Hornsby, M.J.), <u>report and recommendation adopted</u>, 2010 WL 2246393 (W.D. La. May 28, 2010) (Stagg, J.). The City of New Orleans is a proper suable entity and defendant, not its "police department."

[6]Plaintiffs' argument appears to be based on Clipps's testimony that the incident occurred shortly after 7:00 a.m., not on plaintiffs' own affidavits that it happened about 9:30 p.m. In either case, it is undisputed that Clipps was off duty, but wearing his uniform.

I find that factual disputes, including particularly conflicting inferences that a factfinder could reasonably make concerning Clipps's motives, intent and conduct when he entered the Barrios home, preclude summary judgment as to whether he was in the course and scope of his employment at the time of the incident.

The principle of vicarious liability or respondeat superior is codified in Louisiana Civil Code article 2320, which provides that an employer is liable for the tortious acts of its employees "in the exercise of the functions in which they are employed." The issue for the court is whether Clipps's intentional acts against Monica and Christopher were sufficiently employment-related that vicarious liability should be imposed upon the City Defendants for his conduct. This is not exclusively a question of law, but is a <u>mixed</u> question of fact and law. <u>Russell v. Noullet</u>, 721 So. 2d 868, 871 (La. 1998); <u>Bates v. Caruso</u>, 881 So.2d 758, 761 (La. App. 4th Cir. 2004).

The Louisiana Supreme Court has explained that

> [w]hile the course of employment test refers to time and place, the scope of employment test examines the employment-related risk of injury. The inquiry requires the trier of fact to determine whether the employee's tortious conduct was "<u>so closely connected in time, place and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous</u> to the employer's interests." <u>LeBrane v. Lewis</u>, 292 So. 2d 216, 218 (La. 1974).FN5
>> FN5. The <u>LeBrane</u> factors inquire into:
>> (1) whether the tortious act was primarily employment rooted;

> (2) whether the [tortious act] was reasonably incidental to the performance of the employee's duties;
> (3) whether the act occurred on the employer's premises; and
> (4) whether it occurred during the hours of employment.
> LeBrane, 292 So. 2d at 218.

Russell, 721 So. 2d at 871 (additional citations omitted) (emphasis added).

> It is not necessary that all four [LeBrane] factors be met in order to find liability.  There are no magical requirements and each case must be decided on its own merits.  "Generally speaking, an employee's conduct is within the course and scope of his employment if the conduct is of the kind that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer."

Bates, 881 So. 2d at 762 (quoting Orgeron v. McDonald, 639 So. 2d 224, 226-27 (La. 1994)) (citing Miller v. Keating, 349 So. 2d 265 (La. 1977)) (emphasis added).  The Louisiana courts "reject the argument that [an off duty police officer] was always 'on the job' as a police officer."  Id. at 763 (citing Roberts v. Benoit, 605 So. 2d 1032 (La. 1991)).

In both Russell and Brasseaux v. Town of Mamou, 752 So. 2d 815 (La. 2000), the Louisiana Supreme Court found that the employer was not vicariously liable for the tortious conduct of off-duty police officers.  These cases are instructive regarding the course and scope of employment under Louisiana law, but distinguishable on their facts.  In Brasseaux, Lavergne was an off-duty, part-time police officer who was drinking with a friend, Bordelon, at a bar outside the parish where Lavergne was employed.  Lavergne

was not in uniform. After Bordelon attacked a man in the parking lot, the plaintiff bar owner, Brasseaux, came outside. Lavergne's friend also attacked Brasseaux. Lavergne immediately displayed a badge to the bystanders and stated that he was a police officer with the Town of Mamou, with the intent of keeping the crowd at bay and protecting his friend and himself. Lavergne himself then kicked Brasseaux. Id. at 817. The Supreme Court concluded that "Lavergne's specific conduct of representing himself as a police officer, while arguably an aspect of police duty, was done for the purpose of fleeing the scene of an aggravated battery in which he was involved, and evading arrest by the St. Landry Parish authorities." Id. at 822. Lavergne's "sole motive for displaying the badge was simply to intercede long enough to flee from the scene and the angry crowd" with his friend, which were "purely personal" motives that took his conduct outside the course and scope of his employment. Id. at 823.

In Russell, the Supreme Court also held that an off-duty New Orleans police officer's assault of a bystander and shooting into a crowd were motivated by purely personal pursuits. Officer Noullet and his brothers were at an outdoor social gathering when one of the brothers got into a fight. Russell, 721 So. 2d at 870-71. "Even if Officer Noullet was acting as a police officer when he attempted to break up the fight involving his brother, he clearly was not acting in that capacity when he assaulted Miller [the bystander, who was writing down Officer Noullet's license plate number]. The tortious

21

assault on Miller clearly was motivated by Officer Noullet's purely personal considerations, entirely extraneous to the City's interests in keeping the peace." Id. at 872. "Officer Noullet's [subsequent] fear of injury by the crowd . . . was brought on by a forseeable [sic] reaction to his attack on Miller and not by a reaction to his efforts to restore peace in the earlier fight. We conclude that Officer Noullet's shooting into the crowd to protect himself from the pursuing mob" was also personally motivated and unrelated to his earlier, arguably police-related effort to restore peace. Id. at 873.

In the instant case, by contrast to the facts in Brasseaux and Russell, it cannot be said as an undisputed matter that Clipps was acting out of purely personal motives. He was wearing his uniform and was just barely off duty. On the current record, his entry into and search of the Iberville Street house and the Barrios home was for the police purpose of investigating tips about drug dealing that he had received. Investigation of persons for suspected drug dealing is conduct of the kind Clipps was employed to perform. He would have reported his findings to his superiors if he had found evidence of drug dealing. Thus, his investigation was activated at least in part by a purpose to serve the City of New Orleans in his capacity as police officer. If believed by the factfinder, Clipps's own testimony, together with the testimony of the plaintiff-victims, is more than sufficient to support a finding that his heinous intentional torts, actionable under state law, were performed in the course and scope of the City's employment. At

a minimum, material fact questions remain in dispute whether his motives in this case were purely personal, as opposed to for employment/law enforcement purposes; whether the totality of the circumstances demonstrates that he was in the course and scope of his employment; and whether his employers should be "held liable for torts of the [off-duty police officer in uniform] where the law enforcement officer has abused the 'apparent authority' given such officer to act in the public interest." Sullivan v. Quick, 465 So. 2d 254, 257-58 (La. App. 3d Cir. 1985) (citing Applewhite v. City of Baton Rouge, 380 So. 2d 119, 122 (La. App. 1st Cir. 1979)).

While his criminal conviction for malfeasance in office does not necessarily establish that Clipps was acting within the course and scope of his employment for purposes of the City Defendants' vicarious civil liability, the definition of the crime at least creates a permissible inference that he was acting in an official capacity. Criminal malfeasance in office occurs when a public officer: "(1) Intentionally refuse[s] or fail[s] to perform any duty lawfully required of him, as such officer or employee; or (2) Intentionally perform[s] any such duty in an unlawful manner." La. Rev. Stat. § 14:134(A). Conduct that violates a person's constitutional rights, such as the use of excessive force by a police officer, can violate the statute. State v. Coker, 625 So. 2d 190, 195 (La. App. 3d Cir. 1993). Clipps pled guilty to malfeasance in office, thus admitting that he was "acting in his official capacity and engaged in the performance of

a duty, which is required by law, in order to support conviction." State v. Hendry, 996 So. 2d 352, 362 (La. App. 2d Cir. 2008).

Accordingly, on this record, summary judgment on plaintiffs' vicarious liability claims under Louisiana state law is inappropriate, and the motion is denied in that regard. I will submit to the jury at trial the question whether Clipps's actions were done in the course and scope of his employment as a police officer by the City.

> B. The City Defendants Are Entitled to Summary Judgment on Plaintiffs' Section 1983 Claims

Section 1983 provides a private cause of action against those who, under color of law, deprive a citizen of the United States of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

Of course, the doctrine of respondeat superior, which imposes liability upon the City for Clipps's state law wrongs if he was acting in the course and scope of his employment, does not apply to Section 1983 claims. Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011); James v. Harris Cnty., 577 F.3d 612, 617 (5th Cir. 2009). Instead, plaintiffs allege in their complaint that the City Defendants are liable to them under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978), because these defendants failed to adequately hire, train and supervise New Orleans Police Department officers, to take appropriate disciplinary action for officer misconduct and to adopt policies to prevent civil rights abuses of criminal suspects by officers. Plaintiffs further allege that

the City Defendants condoned a pattern, practice and custom of intimidation and abuse by police officers.  Plaintiffs contend that these policies or lack of policies were the driving force behind Clipps's unlawful entry, unlawful detention and use of excessive force against them.

In their memorandum in opposition to the City Defendants' summary judgment motion, plaintiffs argue specifically that Clipps should not have been hired because of his record of prior arrests and traffic citations and because he had "several" academic failures, two instances of failing to meet fitness standards and one disciplinary violation of uniform standards during his police academy training.  They contend that the City should not have retained Clipps as an officer because he had one disciplinary violation after leaving the academy, which he testified was a verbal reprimand for failing to write a report of a dog bite.[7]  In support of these arguments, plaintiffs rely on the report of their expert, Lee Dresselhaus, Plaintiffs' Exh. E, Record Doc. No. 68-7; and the March 16, 2011 report of the Justice Department's "Investigation of the New Orleans Police Department."  Plaintiffs' Exh. D, Record Doc. No. 68-6.

---

[7]Plaintiffs attorneys asked Deputy Chief Landry and Commander Nevil to assume during their depositions that Clipps received a written letter of reprimand.  However, no such letter is in evidence.

1.      Municipal and supervisory liability under *Monell*

A municipality or other local government may be liable under Section 1983 "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation.   But, under § 1983, local governments are responsible only for their <u>own</u> illegal acts.   They are not vicariously liable under § 1983 for their employees' actions."   <u>Connick</u>, 131 S. Ct. at 1359 (quotations and citations omitted).   An official-capacity suit against former Police Superintendent Riley "is, in all respects other than name, to be treated as a suit against the entity.   It is not a suit against the official personally, for the real party in interest is the entity."   <u>Goodman v. Harris Cnty.</u>, 571 F.3d 388, 394-95 (5th Cir. 2009) (quotations omitted) (citing <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997); <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985); <u>Monell</u>, 436 U.S. at 690 n.55 (1978)).   Thus, the City Defendants cannot be held liable under Section 1983 pursuant to a theory of respondeat superior simply because Clipps was in their employ or under their supervision.   <u>Connick</u>, 131 S. Ct. at 1359; <u>James</u>, 577 F.3d at 617.

Because plaintiffs' claims against Superintendent Riley in his official capacity "are really suits against the governmental entity," <u>Goodman</u>, 571 F.3d at 396, plaintiffs' attempt to hold Superintendent Riley "liable for failing to train and supervise [Clipps] . . . is subsumed within [their] identical claim against" the City of New Orleans. <u>Id.</u>   The

26

analysis of plaintiffs' claims against Superintendent Riley in his official capacity is therefore identical to the analysis of their claims against the City.

To hold Superintendent Riley liable personally, plaintiffs must establish either that "'(1) he affirmatively participate[d] in the acts that cause[d] the constitutional deprivation, or (2) he implement[ed] unconstitutional policies that causally result[ed] in the constitutional injury.'" Porter v. Epps, No. 09-60324, 2011 WL 4471051, at *4 (5th Cir. Sept. 28, 2011) (quoting Gates v. Tex. Dep't of Protective & Regulatory Servs., 537 F.3d 404, 435 (5th Cir. 2008)).  "It is facially evident that this test cannot be met if there is no underlying constitutional violation." Rios v. City of Del Rio, 444 F.3d 417, 425-26 (5th Cir. 2006) (citing Breaux v. City of Garland, 205 F.3d 150, 161 (5th Cir. 2000)).

Each of plaintiffs' claims that the City Defendants failed to hire, train and supervise Clipps adequately or to promulgate constitutionally adequate policies are analyzed under the same standards.  Bd. of Cnty. Comm'rs, 520 U.S. at 410-11; Porter, 2011 WL 4471051, at *4; Gros v. City Grand Prairie, 34 F. App'x 150, 2002 WL 494002, at *5 (5th Cir. 2002).   Under those standards, plaintiffs

> must prove that action pursuant to official municipal policy caused their injury.  Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.  These are action[s] for which the municipality is actually responsible.

<u>Connick</u>, 131 S. Ct. at 1359(quotations and citations omitted).  "The existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority."  <u>Valle v. City of Houston</u>, 613 F.3d 536, 542 (5th Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 2094 (2011) (citation omitted).

Thus, a supervisor or municipality may "be liable for failure to supervise or train if:  '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'"  <u>Porter</u>, 2011 WL 4471051, at *4 (quoting <u>Goodman</u>, 571 F.3d at 395).

"Where a plaintiff fails to establish deliberate indifference, the court need not address the other two prongs of supervisor liability."  <u>Goodman</u>, 571 F.3d at 395 (citation omitted).

### 2.    The deliberate indifference standard

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of" Section 1983.  <u>Connick</u>, 131 S. Ct. at 1359.  However,

> a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  <u>See</u> <u>Oklahoma City v. Tuttle</u>, 471

28

> U.S. 808, 822-823 . . . (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in <u>Monell</u>"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to <u>deliberate indifference to the rights of persons with whom the [untrained employees] come into contact</u>. Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.

<u>Id.</u> at 1359-60 (additional quotations and citations omitted) (emphasis added).

Deliberate indifference is "a considerably higher standard than negligence." <u>Porter</u>, 2011 WL 4471051, at *7 & n.6 (Owen, J., concurring); <u>accord</u> <u>Valle</u>, 613 F.3d at 547; <u>see also</u> <u>Bd. of Cnty. Comm'rs</u>, 520 U.S. at 407 ("A showing of simple or even heightened negligence will not suffice.").

> "[D]eliberate indifference" is a stringent standard of fault, requiring proof that a <u>municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights,</u> the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.

<u>Connick</u>, 131 S. Ct. at 1360 (quotations and citations omitted) (emphasis added).

"As our precedent makes clear, proving that a municipality itself actually caused a constitutional violation by failing to train the offending employee presents difficult problems of proof, and we must adhere to a stringent standard of fault, lest municipal

liability under § 1983 collapse into <u>respondeat superior</u>" liability for the acts of the municipality's employees.   <u>Id.</u> at 1365 (quotations and citations omitted).

"'A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights.'" <u>Porter</u>, 2011 WL 4471051, at *4 (quoting <u>Rhyne v. Henderson Cnty.</u>, 973 F.2d 386, 392 (5th Cir. 1992)).

Deliberate indifference for purposes of a failure to train claim "ordinarily" requires plaintiffs to prove

> [a] <u>pattern of similar constitutional violations by untrained employees</u> . . . . Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action–the "deliberate indifference"–necessary to trigger municipal liability.  Without notice that a <u>course of training is deficient in a particular respect,</u> decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

<u>Connick</u>, 131 S. Ct. at 1360 (quotations and citations omitted) (emphasis added); <u>accord</u> <u>Valle</u>, 613 F.3d at 547.

Thus, "[p]roof of more than a single instance of lack of supervision causing a violation of constitutional rights is required before such lack of training can constitute deliberate indifference."  <u>Lewis v. Pugh</u>, 289 F. App'x 767, 772 (5th Cir. 2008) (citing <u>Thompson v. Upshur County</u>, 245 F.3d 447, 458 (5th Cir. 2001)); <u>accord</u> <u>Valle</u>, 613 F.3d at 547; <u>Sanders-Burns</u>, 594 F.3d at 378.

For Superintendent Riley to have acted with deliberate indifference, he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Goodman, 571 F.3d at 395 (quotation omitted); accord Lewis, 289 F. App'x at 772. "Furthermore, for a supervisor to be liable for failure to train, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform. Moreover, for liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." Goodman, 571 F.3d at 395 (quotations omitted).

Proof of the need for better hiring practices, training or supervision does not itself establish that the City Defendants are liable. "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability. [P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct[,] will not suffice." Connick, 131 S. Ct. at 1363-64 (quotation omitted).

Even "showing the 'obviousness' of a need for additional training" regarding the constitutional obligations of police officers may not be enough to establish deliberate indifference because it does not necessarily mean that the officers "will so obviously make wrong decisions that failing to train them amounts to a decision by the city itself

to violate the Constitution." <u>Id.</u> at 1365 (quotation and citation omitted).  To prove deliberate indifference, plaintiffs need to show that Superintendent Riley "was on notice that, absent additional specified training, it was highly predictable that the [police officers] . . . would be confounded by those gray areas and make incorrect decisions as a result.  In fact, [plaintiffs have] to show that it was <u>so</u> predictable that failing to train the [officers] amounted to <u>conscious disregard</u> for" plaintiffs' constitutional rights." <u>Id.</u> (citation omitted) (emphasis by Supreme Court).

Thus, plaintiffs bear the burden of proving both that Superintendent Riley was deliberately indifferent to the need to hire, train and supervise Clipps regarding his constitutional obligations with respect to incidents of the type alleged in this action <u>and</u> that the lack of adequate hiring practices, training or supervision actually caused the constitutional violations.  <u>Id.</u> at 1358 & n.1.

   3. <u>The causation standard</u>

To establish causation, plaintiffs must prove that the inadequate policy was the "moving force" or actual cause behind Clipps's violations of their civil rights. <u>Valle</u>, 613 F.3d at 541-42; <u>James</u>, 577 F.3d at 617.  To show "'moving force' causation," plaintiffs must demonstrate a "'direct causal link'" between the municipality's policy and the deprivation of their federal rights.  <u>Valle</u>, 613 F.3d at 542, 546 (quoting <u>Bd. of Cnty. Comm'rs</u>, 520 U.S. at 404); <u>accord</u> <u>James</u>, 577 F.3d at 617.  "[T]he connection must be

more than a mere 'but for' coupling between cause and effect.  The deficiency in training[, hiring, or supervision] must be the actual cause of the constitutional violation." Valle, 613 F.3d at 546 (quotation omitted); see also Connick, 131 S. Ct. at 1368 (Scalia, J., concurring) (quoting City of Canton, 489 U.S. at 391) ("'the identified deficiency in a city's training program [must be] closely related to the ultimate injury.'").

Furthermore, a demonstrated need for additional training or supervision, even if defendants were deliberately indifferent to that need, does not alone prove causation. "Of course, if evidence of a need for training, by itself, were sufficient to prove that the lack of training 'actually caused' the violation at issue, no causation requirement would be necessary because every plaintiff who satisfied the deliberate indifference requirement would necessarily satisfy the causation requirement."  Id. at 1358 n.1.

          4.     <u>Plaintiffs have not shown any genuinely disputed issue of fact regarding the City Defendants' deliberate indifference in their hiring, training and supervision of Clipps.</u>

Plaintiffs argue that the City Defendants were deliberately indifferent to the civil rights of persons with whom Clipps would come into contact when defendants hired him as a New Orleans police recruit, despite his record of three arrests and eight traffic citations containing 20 traffic charges, and when they trained and retained Clipps as an officer despite his academic record at the police academy and his disciplinary violation for failing to file a report of a dog bite.  To establish both deliberate indifference and

causation, plaintiffs rely on the report of their expert, Lee Dresselhaus, dated September 19, 2011, Plaintiffs' Exh. E, Record Doc. No. 68-7; the Justice Department report entitled "Investigation of the New Orleans Police Department," dated March 16, 2011, Plaintiffs' Exh. D, Record Doc. No. 68-6; and the deposition testimony of New Orleans Police Commander Bernell Nevil, Jr. and his immediate supervisor, Deputy Chief of Management Services Stephanie Landry, which were taken after Dresselhaus completed his report.  Plaintiffs' [Supplemental] Exhs. B and C, Record Docs. Nos. 87-2, 87-3.  I find that plaintiffs' evidence fails to demonstrate any deliberate indifference by the City Defendants.

According to Dresselhaus's curriculum vitae, he has been a licensed journeyman private investigator since February 2009, specializing in criminal defense investigation. He was a 19-year veteran employee of the Slidell Police Department when he retired honorably in 2009 with the rank of lieutenant.  He last worked as an investigator in the Internal Affairs Division of the Slidell Police Department and was previously a deputy patrol commander.  Plaintiffs' Exh. F, Record Doc. No. 68-8.  The City Defendants have not objected to Dresselhaus's qualifications to testify as an expert.  Accordingly, I will assume without deciding, solely for purposes of the pending summary judgment motion, that Dresselhaus could qualify as an expert in the hiring and training of police officers.

As to the City Defendants' hiring practices, Dresselhaus in his report quotes the

Justice Department report, which recognized that the New Orleans Police Department's

> "longstanding failure to prioritize the recruitment of high-quality candidates contributes to the chronic, Department-wide problems we observed, including inappropriate and disrespectful conduct in the community, corruption, unnecessary uses of force, and improper stops and searches. . . .  [The Police Department has] done little since Hurricane Katrina to find or attract highly-qualified candidates . . . .  The Department has been aware of deficiencies in its recruitment efforts, yet for years failed to act meaningfully to address them."

Dresselhaus report, Plaintiffs' Exh. E, Record Doc. No. 68-7 at p. 5 (quoting Justice

Department report, Plaintiffs' Exh. D).

Dresselhaus states in his report that Clipps's background of one juvenile arrest,

two adult arrests, one of which was a felony, and 20 traffic charges "clearly shows a

disregard if not a disdain for law and law enforcement" and was "substandard for hiring

in any police jurisdiction with which I am familiar."  Id. at p. 1.  Dresselhaus opines that

Clipps "should not have been considered 'acceptable' by the NOPD for the highly

responsible position of police officer" because his "arrest record alone . . . should have

been enough to warrant disqualification.  That a recruit should have twenty traffic related

charges in his background and still be considered approved for hire is unconscionable."

Id. at p. 5.

The underlying facts regarding the hiring of Clipps do not support Dresselhaus's

conclusory opinions.  Clipps told the background investigator in June 2007 that he had

received one traffic citation in May 2006, two in April 2005 and one in June 1999.  An

investigator reviewed the Orleans Parish Traffic Court records and found that Clipps had

received a traffic citation on April 4, 2005 for "No Driver License on Person" and

"Unlawful Use Driver License"; and another on May 24, 2004 for "Signal Method" and

"Unlawful use of Driver License."  Record Doc. No. 87-1, Plaintiffs' [Supplemental]

Exh. A at pp. 2-3.  The investigator also found some very old citations:  on June 23, 1999

for two violations; April 14, 1999 for five violations; October 10, 1998, two separate

citations for three and four violations, respectively; March 13, 1998 for one violation;

and January 3, 1991 for one violation.  All of the citations had been paid.  Id. at pp. 3-4.

Clipps testified that he had been arrested a couple of times for driving with a suspended

driver's license because he had failed to have his license reinstated after paying earlier

traffic citations, but that the suspension had been resolved before he applied to the Police

Department.  The Traffic Court records support his testimony.

Dresselhaus's report does not specify the dates, charges or dispositions of Clipps's

three reported arrests, but the complete background investigation report that plaintiffs

filed with their supplemental memorandum reveals that Clipps told the police department

investigator he had been arrested for shoplifting at age 16 in 1988, in April 1999 during

a traffic stop for possession of a stolen vehicle and in April 2005 for driving with a

suspended driver's license.  The investigator spoke to a clerk in the Criminal District

36

Court for the Parish of Orleans, who advised that the possession of a stolen vehicle charge had been refused in July 1999 due to insufficient evidence. The suspended driver's license had also been resolved and all traffic citations had been paid.

Clipps was 35 years old when he was hired as a police officer in 2007. His juvenile arrest occurred 19 years earlier, while the stolen vehicle arrest, for which charges were refused, occurred eight years before he applied to the Police Department. He was never convicted of any crimes.

Clipps revealed four of his traffic charges to the New Orleans Police Department. An investigator found the remainder of the citations upon review of the Traffic Court records. Dresselhaus opines that Clipps "was less than honest with [the background investigator] . . . about the number of violations he received. . . . The apparent lack of honesty seemed to have little bearing on whether or not he would be deemed as qualified to be a police officer in the City of New Orleans." Id. at pp. 4-5.

The Police Department investigator was aware of Clipps's traffic citations, all of which were at least two years old and the majority of which were at least eight years old. Clipps's failure to report the older citations to the investigator does not necessarily lead to Dresselhaus's inference that Clipps was dishonest or support Dresselhaus's implication that the Police Department should have disqualified Clipps for dishonesty. Clipps simply may not have been able to remember all of the citations that were more

than eight years old, or the investigator may not have asked him about such distant citations. Regardless of the reason for the lapse, the investigator ultimately knew about all of Clipps's citations and arrests and his lack of convictions for any crimes. The investigator and two Police Department supervisors decided that, on the total record, Clipps "was not found to have violated the Superintendent's hiring criteria" and was approved for hiring. Id. at pp. 1-4; background investigation report, Plaintiffs' Exh. G, Record Doc. No. 68-9 at p. 4. No reasonable fact finder could find that plaintiffs' evidence creates a genuine dispute of material fact that the City Defendants should not have hired Clipps as a police recruit.

As to plaintiffs' allegations regarding Clipps's training, Dresselhaus again quotes the Justice Department's report that the Police Department's

> "training for the past several years is severely deficient in nearly every respect . . . . Shortcomings at the recruit, field, and in-service stages of training have left NOPD officers ill-equipped to perform their duties in a safe, constitutional, and respectful manner. We found systemic problems in training of every type . . . .
>     Officers receive an insufficient amount of training . . . and the instruction officers do receive is often out-of-date, conflicts with NOPD policies or current legal requirements . . . . Our investigation found direct links between inadequate training and serious, systemic problems in use of force; stops, searches, and arrests; [and] supervision . . . .

Dresselhaus report, Plaintiffs' Exh. E, Record Doc. No. 68-7 at pp. 5-6.

Dresselhaus examined Clipps's training records, including 112 of the Daily Observation Reports from his field training program. During twelve weeks of field

38

training after graduating from the academy, a new officer is graded on a scale from one (worst) to seven (best) with four being "the midline 'acceptable' rating." Id. at p. 6. Clipps consistently scored "all fours and some fives. Marks below a '4' . . . are rare in Clipps'[s] case." Id. Admitting that this "would not stand as anecdotal evidence of neglect in the training process because a truly outstanding . . . recruit may receive high marks," Dresselhaus nonetheless opines that

> Clipps was anything but an outstanding recruit. There are several documented instances of academic failure as well as two instances of failing to meet the NOPD's fitness standards and one disciplinary writeup for a violation of uniform standards. Taken as a whole picture, it is hardly likely that former Officer Clipps would have been the kind of recruit to have scored high early and consistently in the Field Training Officer program.

Id. (emphasis added). Dresselhaus then cites the sole disciplinary violation that Clipps received as an officer, although Dresselhaus fails to mention that the violation was for failure to file a report of a dog bite and resulted in a mere verbal reprimand. Based on these scant facts, Dresselhaus concludes: "To have recruited, then retained Officer Clipps was in the opinion of this investigator an ongoing act of negligence on the part of the NOPD and the City of New Orleans that resulted in egregious violations of the persons and the rights of the Barrios family." Id. (emphasis added)

Dresselhaus's opinions fail to establish deliberate indifference in training or supervision. First, deliberate indifference is "a considerably higher standard than

negligence." <u>Porter</u>, 2011 WL 4471051, at *7 & n.6 (Owen, J., concurring); <u>accord</u> <u>Bd.</u> <u>of Cnty. Comm'rs</u>, 520 U.S. at 407.  Even if the facts on which Dresselhaus relied supported his opinion (which they do not, as discussed below), he opines only that the City Defendants were negligent.  This cannot carry plaintiffs' burden to prove deliberate indifference.

Second, Dresselhaus's opinions are speculative, conclusory, unsupported by the facts and insufficient to show deliberate indifference.  He does not indicate in how many instances Clipps failed academically, does not state in what subjects the failures occurred and does not acknowledge that Clipps ultimately passed all of his course work.  Clipps testified that he failed three daily tests during a 16-to-18-week training course and that he passed each of the failed tests on his second try.  Despite acknowledging Clipps's actual record of acceptable to above average daily scores during his Field Officer Training, Dresselhaus engages in rank speculation when he states that "<u>it is hardly likely</u> that former Officer Clipps would have been the kind of recruit to have scored high."  No factfinder could reasonably infer that three failed (but ultimately passed) tests, two failures to meet fitness standards and one violation of uniform standards during a 16-to-18-week program would put any trainer or supervisor on notice that the recruit is likely to violate a suspect's constitutional rights to be free from unlawful seizure or excessive force.  Clipps's consistently average to above average daily field training scores

combined with a few, minor, academic or training lapses do not in any way support a conclusion that he was "hardly likely" to be a good recruit.

Furthermore, the portions of the Justice Department report quoted in Dresselhaus's report do not create any disputed issue of material fact concerning the City Defendants' allegedly deliberate indifference to plaintiffs' rights to be free from unlawful home invasion, unlawful detention, sexual assault or excessive force. The Justice Department investigation generically found deficiencies in recruiting and training that, in the opinion of those investigators, had direct links to chronic and widespread problems in the Police Department, including unconstitutional uses of force and unlawful seizures. Even if the entire report was admissible, however, it specifically states that "[w]e make no assertions regarding the culpability [for any unconstitutional acts] of any individual." Justice Department report, Plaintiffs' Exh. D, Record Doc. No. 68-6 at p. 7 n.1 (p. vi of the report).

Neither Dresselhaus's nor the Justice Department's report indicate either that Clipps's actions were investigated or that the investigators found any other constitutional violations similar to his actions. Plaintiffs "cannot show a pattern of [any type of constitutional violations] . . . without some link between that [report] and specific instances of" constitutional violations similar to those of Clipps. Valle, 613 F.3d at 548. Although the Justice Department report "does tend to suggest that prior [unnecessary

uses of force, improper stops and searches and other constitutional violations] in fact had

occurred, . . . it does not establish a pattern of constitutional violations.  Prior instances

must point to the specific violation in question; 'notice of a pattern of <u>similar</u> violations

is required.'"  <u>Id.</u> (quoting <u>Davis</u>, 406 F.3d at 383).  "Some greater level of detail about

these prior [violations] is required.  <u>See</u> <u>Davis</u>, 406 F.3d at 383 ('Prior indications cannot

simply be for any and all "bad" or unwise acts, but rather must point to the specific

violation in question.') . . . ."  <u>Id.</u>

The Justice Department report does not assist plaintiffs in their burden to show

deliberate indifference for inadequate training or hiring because "the focus must be on

the adequacy of the training [or hiring] program in relation to the tasks the particular

officers must perform."  <u>Goodman</u>, 571 F.3d at 395 (quotation omitted).  Here, plaintiffs

have failed to show "with specificity how a particular training [or hiring] program is

defective."  <u>Id.</u> (quotation omitted).  The same standards apply to plaintiffs' claim of

inadequate supervision after Clipps was hired and trained.

The two depositions that plaintiffs recently submitted with their supplemental

memorandum do not change this result as to the hiring or training of Clipps.  Neither

Commander Nevil nor his superior, Deputy Chief Landry, was involved in recruitment

or training in 2007.  Commander Nevil took charge of recruitment and training in March

2011.  His only prior involvement with training was his service as an instructor at the

academy for two years in the 1990s.  Deputy Chief Landry became the deputy chief in charge of recruitment and the academy (among other duties) in July 2010.  She was previously the Police Department's human resources director for ten years.  Neither she nor her staff was involved in recruitment, background investigations or training in 2007.

Deputy Chief Landry testified that recruitment standards had changed in 2010. She stated that no class of recruits had been enrolled or graduated since late 2009 or early 2010 because of budgetary problems, not because of deficiencies in the recruitment and training programs.  She could not say whether she would have approved Clipps as a new hire in 2007.  She testified that, under current standards, "we would have some issues" and she probably would not approve hiring him now.  However, she knew that traffic citations were not held against an applicant before 2010.  Commander Nevil testified that he would not approve Clipps for hiring under the current standards.  Thus, neither witness's testimony is probative concerning whether the standards used for hiring Clipps were deficient in 2007, much less whether they were so deficient as to amount to deliberate indifference on the part of the City Defendants.

As to training and supervision, Deputy Chief Landry and Commander Nevil testified that Clipps's failures of intermediate tests during academy training were not significant enough to warrant removing him from the academy.  They stated that Clipps would have been "remediated," i.e., counseled, each time he failed, as most recruits are

to assist them with the academic work.  Commander Nevil testified that Clipps passed all of his ultimate academic benchmarks with an average of 70 percent or better. Commander Nevil testified that a new hire works under the supervision of a Field Training Officer for 12 weeks after graduating from the academy.  The Field Training Officer completes Daily Observation Reports about the new officer, which are scored from one to seven, with a score of four being average.  Commander Nevil did not find it unusual that Clipps received scores of four and five on his Daily Observation Reports. Commander Nevil thought that it was average for a newly graduated officer to receive such scores during field training.  He stated that Clipps fell below average on only three minor occasions and that Clipps received "remediative training" by the Field Training Officer each time.

Deputy Chief Landry testified that, if Clipps had received a letter of reprimand concerning his failure to file a report of a dog bite, the infraction was not considered severe.  Commander Nevil concurred that a letter of reprimand was sufficient under the Police Department's penalty schedule for such a procedural violation and that an officer would not be discharged for such a violation.

To the extent that plaintiffs have produced particular evidence concerning Clipps's pre-recruitment arrests and traffic citations, his statements during the background check, his Field Officer Training record and his post-academy reprimand, nothing in this

evidence creates any inference that Clipps had a propensity for or probability of committing constitutionally unlawful home invasion, unlawful detention, sexual assault or excessive force.  Bd. of Cnty. Comm'rs, 520 U.S. at 412; Lewis, 289 F. App'x at 773 (citing  Roberts v. City of Shreveport, 397 F.3d 287, 294 (5th Cir. 2005))); Valle, 613 F.3d at 549 (citing Brown v. Bryan County, 219 F.3d 450, 462 (5th Cir. 2000)).  The Fifth Circuit's  "case law does not specifically require evidence of such character traits, but such evidence certainly is probative in determining that a 'highly predictable' consequence of sending the particular officers into a particular situation would be a constitutional violation."  Id.  Plaintiffs simply "did not produce evidence to meet the high hurdle of showing that [home invasion, detention, sexual assault or] excessive force was an obvious consequence of" the allegedly inadequate hiring, training or supervisory practices.  Id. at 550.

Nor is there any evidence that the City Defendants actually drew such an inference, even if one might have been drawn.  Goodman, 571 F.3d at 395.

Based on plaintiffs' evidence, no reasonable factfinder could find that the City Defendants were deliberately indifferent during their hiring, training or supervision of Clipps to the civil rights of persons with whom Clipps would come into contact.  At trial, plaintiffs cannot sustain the particular burden of proof imposed as a matter of law for this kind of claim.  Because plaintiffs failed to show a genuine issue of disputed material fact

regarding deliberate indifference, the City Defendants are entitled to summary judgment in their favor on plaintiffs' municipal and supervisory claims under Section 1983.

      5.     <u>Plaintiffs have not shown any genuinely disputed issue of fact regarding causation</u>

In the absence of any genuine issue of disputed fact regarding the City Defendants' deliberate indifference, the court need not address whether plaintiffs can prove that their injuries were caused by the alleged policy failures. Nonetheless, I find that, even if they could prove that the City Defendants had inadequate training, hiring and supervision policies and were deliberately indifferent to plaintiffs' constitutional rights, plaintiffs' evidence is insufficient to create any disputed material fact issue regarding causation.

To defeat summary judgment, plaintiffs must prove that the inadequate policy was the "moving force" or actual cause behind Clipps's violations of their civil rights by demonstrating a "direct causal link" between the policy and the deprivation of their federally protected rights. <u>Valle</u>, 613 F.3d at 541-42; <u>James</u>, 577 F.3d at 617. "[T]he connection must be more than a mere 'but for' coupling between cause and effect. The deficiency in training[, hiring, or supervision] must be the actual cause of the constitutional violation." <u>Valle</u>, 613 F.3d at 546 (quotation omitted).

The only evidence of causation that plaintiffs have proffered is Dresselhaus's report, in which he opines that the allegedly inadequate policies "resulted in egregious

violations of the persons and the rights of the Barrios family." Dresselhaus report, Plaintiffs' Exh. E, Record Doc. No. 68-7 at p. 6. This purely conclusory opinion is not supported by the facts. The Justice Department report, as quoted in Dresselhaus's report, cannot prove a direct causal link between the defective training and hiring practices that it described and Clipps's <u>specific</u> conduct. Nothing in the facts regarding Clipps's hiring, training and disciplinary record, as described in the preceding section, leads to any inference that the policies underlying those facts was the moving force behind or direct cause of plaintiffs' injuries. Plaintiffs and Dresselhaus "offered no empirical evidence to connect [the] general theory" of the Justice Department report to the City Defendants' specific hiring, training and supervision of Clipps or to Clipps's specific conduct.

The only causation evidence in the record is Clipps's testimony that he decided, without telling any of his superiors of his intent or his actions, to enter the Barrios home unlawfully and detain plaintiffs. These events occurred despite Clipps having been trained, as he testified without contradiction in the record, during "a whole block of classes" over one to five days and with written materials regarding what a police officer legally could and could not do and his receipt of a "big book . . . with all the rules of a police officer." A "bad-faith, knowing violation [of constitutional rights] could not possibly be attributed to lack of training." Connick, 131 S. Ct. at 1369 (Scalia, J., concurring).

47

"Although [Clipps's] decision to [enter] into the home was arguably the 'moving force' behind the constitutional violations that resulted . . . , because his decision was not a decision by a final policymaker of the City, the City cannot be liable." Valle, 613 F.3d at 544.  Thus, plaintiffs "have failed to present sufficient evidence of causation as to the entry of their home.  That decision was made by [Clipps] . . . .  [A]ny alleged lack of . . . training was not the 'moving force' in [Clipps's ] decision to enter the home" and his subsequent unlawful detention, use of excessive force and sexual battery.  Id. at 546.

Plaintiffs have not carried their summary judgment burden to show any disputed issues of fact regarding the City Defendants' deliberate indifference to plaintiffs' civil rights or causation of plaintiffs' injuries.  Accordingly, the City Defendants are entitled to summary judgment in their favor on plaintiffs' claims of municipal and supervisory liability under Monell.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the City Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART, as follows. The motion is granted and plaintiffs' Section 1983 claims against the City of New Orleans, the New Orleans Police Department and former Police Superintendent Warren Riley are DISMISSED WITH PREJUDICE.

48

The motion is denied as to plaintiffs' claims under Louisiana law that the City Defendants are vicariously liable for Clipps' state law torts.

The claims remaining in this action are plaintiffs' claims that the City Defendants are vicariously liable under Louisiana law for Clipps's state law torts, and all of plaintiffs' claims against defendant Darrius Clipps under Section 1983 and Louisiana state law. Accordingly, **IT IS FURTHER ORDERED** that the pretrial conference will proceed as scheduled at 2:00 p.m. on October 25, 2011. All parties should be prepared in accordance with the pretrial notice previously issued by the court. A jury trial will commence at 8:30 a.m. on November 7, 2011.

New Orleans, Louisiana, this ___20th___ day of October, 2011.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE5